# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

CASTLE MOUNTAIN COALITION, et al.,

                    Plaintiffs,

     v.

OFFICE OF SURFACE MINING
RECLAMATION AND ENFORCEMENT,
et al.,

                Defendants,

           and

USIBELLI COAL MINE, INC. and STATE
OF ALASKA,

                Intervenor-
                Defendants.

Case No. 3:15-cv-00043-SLG

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This is an administrative appeal from a decision of the Office of Surface Mining Reclamation and Enforcement (OSM).  Plaintiffs are Castle Mountain Coalition, Cook Inlet Keeper, Alaska Center for the Environment, Alaska Community Action on Toxics, The Sierra Club, and Chickaloon Village Traditional Council (collectively, Castle Mountain). Defendants are comprised of OSM, the United States Department of the Interior, and Joseph Pizarchik, in his official capacity as Director of OSM (collectively, Federal Defendants).  There are two Intervenor-Defendants: Usibelli Coal Mine, Inc. and the State of Alaska.  Coal River Mountain Watch appears as *amicus curiae*.  Before the Court are cross-motions for summary judgment filed by Castle Mountain and the Federal

Defendants.[1]  The Court heard oral argument on the two motions on January 29, 2016.[2]

## I.    BACKGROUND

Plaintiffs are several non-profit organizations and the governing body of a federally-recognized Native Village. They assert that their "members, supporters, and citizens have health, subsistence, cultural, economic, recreational, scientific, environmental, aesthetic, educational, conservation, commercial, and other interests in the Matanuska Valley."[3]  They challenge OSM's decision regarding the State of Alaska's permitting of coal mining operations by Usibelli at the Wishbone Hill Mine near Sutton, Alaska, a community located roughly 60 miles northeast of Anchorage.

At the heart of this dispute is the interpretation of the phrase "shall terminate" in the following statute of the Surface Mining Control and Reclamation Act (SMCRA):

> [A surface coal mining] permit shall terminate if the permittee has not commenced the surface coal mining operations covered by such permit within three years of the issuance of the permit: *Provided*, That the regulatory authority may grant reasonable extensions of time upon a showing that such extensions are necessary by reason of litigation precluding such commencement or threatening substantial economic loss to the permittee, or by reason of conditions beyond the control and without the fault or negligence of the permittee . . . .[4]

---

[1] *See* Docket 36 (Castle Mountain's Motion for Summary Judgment); Docket 58 (Federal Defendant's Cross-Motion for Summary Judgment).  With regard to Castle Mountain's motion, the Federal Defendants responded at Docket 60; Usibelli and the State of Alaska opposed the motion at Dockets 61 and 62, respectively; Castle Mountain replied at Docket 65; and *amicus curiae* Coal River Mountain Watch filed a brief in support of the motion at Docket 51-1.

[2] Docket 76 (Minute Entry).

[3] *See* Docket 19 (First Amended Complaint) at 3–6.

[4] 30 U.S.C. § 1256(c).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 2 of 35

Plaintiffs assert the phrase "shall terminate" in this statute unambiguously means that the permit automatically terminates if mining operations have not commenced within three years from the date of a coal mining permit's issuance and no extension has been granted. OSM found, and all of the Defendants assert to this Court, that the statute is ambiguous and the regulatory authority may interpret, and has reasonably interpreted, it to require administrative termination proceedings to be initiated before a permit may be terminated.

The implementation of SMCRA is overseen by the Secretary of the Interior through OSM. SMCRA establishes minimum nationwide standards for surface coal mining operations, but it also allows states to assume primary jurisdiction (primacy) over the regulation of surface coal mining within the state if the Secretary approves a state program that "provides for the regulation of surface coal mining and reclamation operations in accordance with the requirements of [the Act]."[5] However, in primacy states OSM retains certain enforcement powers under § 1271 of the Act. This statute provides that whenever the Secretary has reason to believe that any person is in violation of any requirement of the Act or any permit condition required by it, "the Secretary shall notify the State regulatory authority" by issuing a ten-day notice (TDN), so termed because if a state regulatory agency "fails within ten days after notification to take appropriate action to cause said violation to be corrected or to show good cause for such failure and transmit notification of its action to the Secretary, the Secretary shall immediately order Federal

---

[5] 30 U.S.C. § 1253.

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 3 of 35

inspection of the surface coal mining operation at which the alleged violation is occurring . . . ."[6]  Moreover, if a primacy state is not enforcing any part of its program, SMCRA states that "the Secretary may provide for the Federal enforcement, under the provisions of section 1271 of [the Act], of that part of the State program not being enforced by such State."[7]

The Secretary approved Alaska's program (ASCMCRA or the Alaska Program) in May 1983, thereby making the Alaska Department of Natural Resources (DNR) the primary regulatory authority for all surface coal mining operations on non-federal and non-Indian lands within Alaska.[8]  Both the State of Alaska and Usibelli maintain that because the Secretary approved the Alaska Program, this case should be determined under Alaska law and the federal statute is "largely irrelevant."[9]  The Court disagrees.  SMCRA sets the minimum standards applicable throughout the nation; state programs that regulate surface coal mining must do so "in accordance with the requirements" of the federal Act.[10]  Accordingly, a state's provisions may be more stringent—but not less stringent—than SMCRA's requirements.[11]  In accordance with this requirement of federal

---

[6] 30 U.S.C. § 1271(a)(1).

[7] 30 U.S.C. § 1254(b).

[8] 30 C.F.R. § 902.10; *see also* AS 27.21.010 *et seq.*

[9] *See* Docket 62 (State Opp.) at 3–4; Docket 61 (Usibelli Opp.) at 11.

[10] *See* 30 U.S.C. §§ 1253(a), 1255.

[11] *See, e.g.*, *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289 (1981) ("Appellees' claims accurately characterize the Act insofar as it prescribes federal minimum standards governing surface coal mining, which a State may either implement itself or else yield to a federally administered regulatory program.").

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 4 of 35

law, the Alaska termination statute substantially tracks the language of SMCRA, as it must. This case concerns the interpretation of the federal termination provision, with which Alaska's parallel provision must, at a minimum, be in accord.

SMCRA prohibits surface coal mining without a permit.[12] Permits are generally valid for five years. However, § 1256(c) of the Act, cited above, provides that a permit "shall terminate" if mining operations do not commence within three years of the permit issuance and sets out the two circumstances when an extension can be granted. A regulatory authority can also renew permits—which is distinct from extending the time to commence mining.[13] In conformance with SMCRA, Alaska's statutory framework tracks these federal provisions.[14]

Pursuant to the Alaska Program, DNR first issued two permits for the Wishbone Hill Coal Project to Idemitsu Alaska, Inc. in September 1991.[15] Idemitsu did not start surface coal mining operations within three years after issuance of the permits. In August 1994, after receiving a request for an extension from Idemitsu, DNR extended the time to start mining operations to September 4, 1996.[16] In September 1995, DNR approved the transfer of the Wishbone Hill permits to North Pacific Mining Corporation (NPMC).[17] In

---

[12] 30 U.S.C. § 1256(a); *see also* 30 C.F.R. § 773.4(a).

[13] *See* 30 U.S.C. § 1256(d).

[14] *See* AS 27.21.010 *et seq.*

[15] A.R. 1382 (Docket 29-1 at 44–49) (Permits).

[16] A.R. 1345 (Docket 29-1 at 8) (Letter Dated August 3, 1994).

[17] A.R. 1202 (Docket 28-9 at 27) (Letter Dated September 19, 1995).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 5 of 35

January 1996, NPMC wrote to DNR, seeking information on the requirements for renewal of the permits.[18]  After additional correspondence, DNR renewed the permits for a five-year period ending September 4, 2001.[19]  DNR's public notice of its permit renewal decision stated "[t]he applicant has again requested an extension for beginning mining due to ongoing marketing efforts."[20]  In a letter accompanying the 1996 permit renewal, DNR informed NPMC that "should mining not commence within this renewal term, then due to the length of time since the original permit application work was completed no further renewals will be considered without an extensive review of the original applications and the baseline information they were based on."[21]  In the decision under review in this case, OSM found that in the 1996 permit renewal DNR "did not expressly address the requirements of AS 27.21.070(b) [Alaska's termination provision] and did not expressly grant a continuation of extension of time to commence mining."[22]

In December 1997, DNR approved the transfer of the permits to Usibelli, subject to the conditions and stipulations of the original permits.[23]  In April 2001, Usibelli applied for a renewal of the permits for an additional five-year term.[24]  In 2002, DNR renewed the

---

[18] A.R. 1206 (Docket 28-9 at 24).

[19] A.R. 1154–54 (Docket 28-8 at 4–5).

[20] A.R. 1150 (Docket 28-8 at 1).

[21] A.R. 1141 (Docket 28-7 at 15).

[22] A.R. 14 (Docket 26-2 at 13-14).

[23] A.R. 1127 (Docket 28-7 at 1).

[24] A.R. 1075 (Docket 28-6 at 5–6).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 6 of 35

permits until September 2006.[25]   In November 2006, DNR renewed the permits for another five-year term expiring in November 2011.[26]   Neither Usibelli's 2001 permit renewal request nor its 2006 permit renewal request contained a request for an extension of the time to commence mining operations; likewise, each permit renewal by DNR was silent in that regard.[27]   Coal mining operations at Wishbone Hill did not begin until June 2010, when Usibelli started building a road from the Glenn Highway to the project site.[28] DNR renewed the permits most recently in October 2014.[29]

Castle Mountain asserts that it "became aware of the invalidity of the permits and unpermitted coal mining operations" in September 2011 when reviewing DNR's 2011 proposal to renew the permits.[30]   In November 2011, Trustees for Alaska submitted a citizen complaint to DNR on behalf of several groups including Plaintiffs, asserting that the permits had terminated by operation of law on September 4, 1996, because no mining operations had commenced by that date.[31]   DNR responded in December 2011, asserting that it had properly renewed the permits in 1996.  DNR added that "while activities prior to 2010 might not rise to the level of 'coal mining operations' as defined by [ASCMCRA],

---

[25] A.R. 1027-37 (Docket 28-4 at 12-22).

[26] A.R. 928–30 (Docket 28-1 at 4–6).

[27] *See* A.R. 1075 (Docket 28-6 at 5–6); A.R. 931 (Docket 28-1 at 7).

[28] *See* Docket 19 at 13, ¶ 64; Docket 24 at 12, ¶ 64; Docket 35 at 10, ¶ 64; Docket 23 at 8, ¶ 64.

[29] *See* A.R. 40–53 (Docket 26-3 at 22–30, Docket 26-4 at 1–5).

[30] Docket 19 (FAC) at 13, ¶ 65.

[31] A.R. 242 (Docket 26-6 at 15).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 7 of 35

coal mining operations did commence as of 2010."[32]  DNR concluded that the Wishbone

Hill permits were "valid and enforceable, and therefore there is no activity that warrants a

Cessation Order to be issued under [the applicable state regulation]."[33]

On December 14, 2011, Trustees for Alaska sent a letter to OSM captioned

"Citizen Complaint" asserting that Usibelli was conducting surface coal mining operations

at Wishbone Hill without valid permits in violation of ASCMCRA.[34]  In response, OSM

issued TDNs to DNR that informed DNR of the Trustees' letter and directed DNR to

respond with an explanation of what action it intended to take or why it did not believe a

permit deficiency existed.[35]

On January 6, 2012, DNR provided a comprehensive response to OSM in support

of its position that "the Alaska Program has taken all appropriate action necessary in

affirming that the Wishbone Hill permits are valid and therefore declining an inspection

and cessation order."[36]  DNR's response acknowledged that the Alaska Program requires

extensions to commence operations to be addressed in the notice of renewal decisions,

and that its 2002 and 2006 permit renewal decisions did not "contain a discussion of

extensions."[37]  But DNR maintained that "by granting a renewal of the permit with full

---

[32] A.R. 247 (Docket 26-16 at 24).

[33] A.R. 247 (Docket 26-6 at 24).

[34] A.R. 249 (Docket 26-6 at 26).

[35] A.R. 746–47 (Docket 27-5 at 12–13).

[36] A.R. 679 (Docket 27-2 at 20).

[37] A.R. 683–84 & n.27 (Docket 27-3 at 4–5 & n.27).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 8 of 35

knowledge of the status of Usibelli's operations (*i.e.,* that coal mining operations had not begun), DNR was implicitly granting an extension when it granted the permit renewals in 2002 and 2006."[38] And while DNR acknowledged that extensions of the date to begin mining operations "should be documented in the permit renewal notices," it asserted that "the failure to do so does not lead to an automatic termination of the permits under the extension statute."[39]

In July 2012, OSM issued its initial evaluation of DNR's January 2012 response and concluded that "DNR's assertion that the permits are valid is not supported by the facts or applicable law."[40] OSM did not observe any ambiguity in the relevant statutes; rather, it repeatedly observed that under those statutes, "a permit terminates by operation of law if a permittee does not begin surface coal mining operations under the permit within three years after the permit is issued."[41] OSM found that DNR had not explicitly granted NPMC's extension request in 1996, and concluded that as a result, the "permits expired on September 4, 1996, by operation of AS 27.21.070(b) when NPMC failed to commence mining by that date." OSM added that "[e]ven if one assumed that DNR's 1996 permit renewal and extension were valid, the subsequent renewals in 2002 and 2006 appear not to have been valid because, once again, neither [Usibelli] nor DNR seem to have made the showing or findings required by AS 27.21.070(b) to justify an extension of time to

---

[38] A.R. 683–84 (Docket 27-3 at 4–5).

[39] A.R. 684–85 (Docket 27-3 at 5–6).

[40] A.R. 640 (Docket 27-1 at 4).

[41] *Id. See also* A.R. 636 (Docket 27 at 163).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 9 of 35

commence mining."[42]

OSM's July 2012 initial evaluation discussed and rejected DNR's "implicit extension" theory, finding it to be at odds with the requirements of AS 27.21.070(b). OSM concluded that based on DNR's submission to date, it could not "make the determination that the standards for appropriate action or good cause for failure to take action have been met because information is missing from the record that may be available from [DNR]."[43] OSM accorded DNR an additional ten days to provide any supplemental information in support of its position.

In August 2012, DNR provided a lengthy supplemental response that challenged OSM's authority to use a ten-day notice process in this circumstance and reiterated DNR's "implicit extension" theory.[44] DNR also asserted that even if OSM had the authority to use the TDN process, it should retract its TDNs for Wishbone Hill because DNR's decision regarding the 2011 permit renewal was then pending.[45]

In November 2014, OSM issued its final decision on Castle Mountain's complaint that is the subject of this appeal.[46] OSM first found that it had the authority to issue the

---

[42] A.R. 642 (Docket 27-1 at 6).

[43] A.R. 644 (Docket 27-1 at 8).

[44] *See* A.R. 212–36 (Docket 26-5 at 12–23, Docket 26-6 at 1–13.).

[45] DNR cited an OSM directive that provided, "OSM will not review pending RA [Regulatory Authority] permitting decisions and will not issue a TDN for an alleged violation involving a permit defect where the RA has not taken relevant permitting action (e.g., permit issuance, permit revision, permit renewal, or transfer, assignment, or sale of permit rights)." A.R. 234 (Docket 26-6 at 9).

[46] A.R. 7–25 (Docket 26-2 at 7–18, Docket 26-3 at 1–7).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 10 of 35

ten-day notices in this context. OSM then reaffirmed its prior determination that DNR had not followed the appropriate procedures in connection with extensions of the time for the permit holders to commence mining operations. In this regard, OSM again rejected DNR's implicit extension theory. But OSM reversed its earlier position regarding permit termination and concluded that federal law does not require surface mining permits to terminate by operation of law when mining operations have not commenced; rather, OSM concluded that a state may permissibly interpret SMCRA to require that an administrative proceeding must be initiated to terminate a permit based on a failure to commence mining operations before the permit can be terminated. OSM then found that "DNR failed to [initiate a termination proceeding], and, consequently, Usibelli was not operating without a permit."[47]

OSM presented two primary reasons in support of its conclusion that SMCRA does not mandate permit termination as a matter of law when an extension of the time to commence mining operations has not been sought or obtained. First, OSM observed that "[u]nder the *Chevron* line of precedent, if SMCRA is silent on the issue of whether termination of permits should automatically result when permits are not commenced within three years, then [OSM] may permissibly interpret the statute (and our regulations implementing the statute) as either effecting an automatic termination or not doing so, so long as the interpretation it adopts is reasonable."[48] Second, OSM cited to cases that

---

[47] A.R. 8 (Docket 26-2 at 8).

[48] A.R. 20 (Docket 26-3 at 2); *see Chevron, U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837, 842–45 (1984).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 11 of 35

recognize the severity of an automatic forfeiture and concluded that "if forfeiture is not mandated by 'clear and unequivocal' language in SMCRA and the applicable Federal regulations, then we should not construe our statute and regulations as imposing this harsh penalty."[49]  Accordingly, OSM found DNR's position regarding permit termination "consistent with both the approved Alaska regulatory program and with the Federal regulations and is no less stringent than section 506(c) of SMCRA [the federal termination provision]."  OSM also found that "[t]he draconian and counterproductive remedy of shutting Usibelli down would run counter to the second purpose of section 506(c), ensuring the prompt development of the nation's coal resources."  OSM concluded that DNR "had 'good cause' for not taking action against Usibelli for operating without a permit."  But OSM stated that DNR "has an affirmative duty to monitor whether timely mining operations are occurring and to issue prompt determinations in cases where mining operations have not commenced within three years."  It directed DNR to work with OSM to formulate "a written Action Plan to address [DNR's] failure to implement [its] program provisions on the timely commencement of mining operations."[50]

Castle Mountain initiated this action in federal district court in March 2015 seeking to vacate and set aside OSM's determination.

---

[49] A.R. 21 (Docket 26-3 at 3); *see also United States v. Model Ford V-8 De Luxe Coach, Motor No. 18-3306511*, 307 U.S. 219, 226 (1939); *Am. Maritime Ass'n v. Blumenthal*, 590 F.2d 1156, 1165 (D.C. Cir. 1978).

[50] A.R. 22–24 (Docket 26-3 at 4–6).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 12 of 35

## II.    JURISDICTION

Plaintiffs have asserted that the Court has subject matter jurisdiction over this action pursuant to 5 U.S.C §§ 702–06 (Administrative Procedures Act or APA), 28 U.S.C. §§ 2201–02 (declaratory judgments), and 28 U.S.C. § 1331 (federal question jurisdiction).

Federal courts lack jurisdiction over APA challenges to agency actions when Congress has provided another "adequate remedy."[51]    The Federal Defendants assert that SMCRA's citizen suit provision would have provided another adequate remedy to Castle Mountain such that Plaintiffs are precluded from bringing an action under the APA. However, to bring a citizen suit under SMCRA, a would-be plaintiff must, as a general rule, give the regulating entity written notice of the violation sixty days before filing the action. Here, it is undisputed that no such sixty-day notice was given.    Therefore, the Federal Defendants maintain that Castle Mountain cannot bring this action at all because Castle Mountain did not provide sixty days' notice to the Secretary as required by SMCRA before commencing this lawsuit.[52]    Nor, argue the Federal Defendants, can Castle Mountain bring an APA challenge because it had an alternative adequate remedy of which it failed to avail itself.[53]

The Federal Defendants maintain that Castle Mountain could have brought a citizen suit under § 1270(a)(2), which provides:

---

[51] 5 U.S.C. § 704; *see also Brem-Air Disposal v. Cohen*, 156 F.3d 1002, 1004 (9th Cir. 1998).

[52] Docket 59 (Memorandum) at 22–23.

[53] *See Or. Nat. Res. Council v. U.S. Forest Serv.*, 834 F.2d 842, 851 (9th Cir. 1987) ("Where plaintiffs may otherwise proceed under the citizen suit provision, they should not be allowed to bypass the explicit requirements of the Act . . . through resort to . . . the APA.").

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 13 of 35

> [A]ny person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this chapter—
>
>     . . . .
>
> (2) against the Secretary . . . where there is alleged a failure of the Secretary . . . to perform any act or duty under this chapter which is not discretionary with the Secretary . . . .[54]

The Federal Defendants assert that this citizen suit provision applies because "the substance" of Castle Mountain's allegations is that "the Secretary had a non-discretionary duty, which she failed to fulfill, to order a federal inspection and issue a cessation order because unpermitted mining was taking place at Wishbone Hill."[55]   Castle Mountain counters that its challenge is limited to the review of a discretionary act by the agency that falls under the APA, an issue which it frames as whether "OSM's determination that the Alaska Department of Natural Resources . . . ha[d] shown good cause for not taking action in this case" was based on an "unlawful interpretation of SMCRA."[56]   Plaintiffs assert they principally seek declaratory relief and vacatur, and not an order compelling OSM to undertake a non-discretionary act.[57]   Thus, Castle Mountain asserts that the

---

[54] 30 U.S.C. § 1270(a)(2).  Other types of citizen suits are authorized in 30 U.S.C. § 1270(a)(1). But that provision has been interpreted to apply only to suits against operators, including the government when it functions as an operator.  *See Ok. Wildlife Fed'n v. Hodel*, 642 F. Supp. 569, 571–72 (N.D. Okla. 1986).

[55] Docket 59 at 21.

[56] Docket 65 (Reply) at 9.

[57] *Id. See also* Docket 19 (First Amended Complaint) at 17; *but see* Docket 37 (Castle Mountain's Memorandum in Support of Plaintiffs' Motion for Summary Judgment) at 43 and Docket 65 (Reply) at 33, in which Castle Mountain also asks the Court to "order the agency to conduct a federal inspection and to take additional appropriate actions," a position it later retracted at oral argument.

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 14 of 35

citizen suit provision in SMCRA does not apply and the Court has subject matter jurisdiction under the APA.

OSM's enforcement duties upon receipt of a citizen complaint are set forth in 30 U.S.C. § 1271(a)(1).[58] That provision does not assign any non-discretionary duties to the agency unless and until the Secretary has found "reason to believe" that a violation exists. Here, Castle Mountain takes issue with OSM's finding that the agency did not have reason to believe that a violation had occurred and asserts that the finding is not in accordance with the law, specifically § 1256(c). Castle Mountain's First Amended Complaint, as framed, does not directly concern the Secretary's non-discretionary actions or duties, and does not seek to compel the Secretary to take some action.[59] Accordingly, the citizen suit provision in § 1270(a)(2) does not provide a jurisdictional basis for the Complaint; thus, the Court has jurisdiction under the APA and 28 U.S.C. § 1331.[60]

---

[58] 30 U.S.C. § 1271(a)(1) provides in part that:

> Whenever, on the basis of any information available to him, including receipt of information from any person, the Secretary has reason to believe that any person is in violation of any requirement of this chapter or any permit condition required by this chapter, the Secretary shall notify the State regulatory authority, if one exists, in the State in which such violation exists. If no such State authority exists or the State regulatory authority fails within ten days after notification to take appropriate action to cause said violation to be corrected or to show good cause for such failure and transmit notification of its action to the Secretary, the Secretary shall immediately order Federal inspection of the surface coal mining operation at which the alleged violation is occurring . . . .

[59] *See* Docket 19 (FAC) at 17; *see also Ok. Wildlife Fed'n*, 642 F. Supp. at 570 ("The Court's jurisdiction under § 1270(a)(2) is limited to compelling the Secretary to take some action.").

[60] *See Chrysler Corp. v. Brown*, 441 U.S. 281, 317 n.47 (1979) (citing *Califano v. Sanders*, 430 U.S. 99 (1977)) ("Jurisdiction to review agency action under the APA is found in 28 U.S.C. § 1331.").

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 15 of 35

## III.  STANDING AND RIGHT TO SUE

The State of Alaska challenges Castle Mountain's standing to bring this case. Under Article III of the Constitution, "[t]he jurisdiction of the federal courts is limited to 'cases' and 'controversies.'"[61]  The Supreme Court has deduced a set of requirements that make up the constitutional minimum of standing:

> [A] plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[62]

Castle Mountain maintains that each Plaintiff "has a mission to protect the Matanuska Valley and traditional Tribal lands from improperly permitted coal mining" where their members and Tribal citizens "reside near, visit, or otherwise enjoy the Matanuska Valley and the mine site for numerous purposes, including recreation, wildlife viewing, and cultural and subsistence practices."[63]  No party asserts that these interests do not satisfy the requirements for Article III standing.

However, in addition to Article III standing, "a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law

---

[61] *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1138 (9th Cir. 2013) (quoting U.S. Const. art. III, § 2).

[62] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

[63] Docket 37 at 24.

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 16 of 35

invoked.'"[64]  The State argues Plaintiffs lack standing because Plaintiffs' "interests are not within the zone-of-interest that [the termination] provision seeks to protect."[65]  The APA provides a cause of action to persons who are "adversely affected or aggrieved by agency action within the meaning of a relevant statute."[66]  In the APA context, the Supreme Court has held that the test is "not especially demanding" and "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue."[67]

The State correctly observes that Castle Mountain's right to sue must be measured against the statutory purposes specific to the termination provision in SMCRA—30 U.S.C. § 1256(c).[68]  The State maintains that the purpose of that termination provision is to "prevent squatting on mining permits," and that it "vindicates purely economic interests."[69]

---

[64] *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387–88 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)) (the zone-of-interests test does not belong in the "prudential" standing rubric but rather "asks whether this particular class of persons has a right to sue under this substantive statute") (quotation marks, formatting, and citation omitted).

[65] Docket 62 at 12.  *See also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (plaintiffs' aggrievements or adverse effects must fall "within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint").

[66] 5 U.S.C. § 702.

[67] *Lexmark*, 468 U.S. at 1389 (quotation marks and citations omitted).

[68] Docket 62 at 8; *see, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 175–76 (1997) ("Whether a plaintiff's interest is arguably protected by the statute within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question . . . but by reference to the particular provisions of law upon which the plaintiff relies.") (quotation marks and formatting omitted); *see also Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1179 (9th Cir. 2000).

[69] Docket 62 at 11–12.

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 17 of 35

In the State's view, the interests expressed in Plaintiffs' declarations "describe the harms associated with *commencement* of mining at Wishbone Hill, not the harms associated with a *failure* to commence mining operations at Wishbone Hill."[70] The State asserts that "[e]nvironmental protection is simply not the purpose of the termination provision." Thus, the State maintains that Castle Mountain's purported interests fall outside the zone of interests protected by the termination provision, such that Plaintiffs have no right to challenge the agency's interpretation of the termination statute under the APA.[71]

Castle Mountain responds that its interests are well within the zone of interests protected by the termination provision, which it asserts has dual goals: "ensuring development of coal resources and ensuring that permits and reclamation plans do not become outdated."[72] Plaintiffs observe that OSM's own regulations "deem[] operating without a 'valid' permit to 'constitute a condition or practice which causes or can reasonably be expected to cause significant imminent environmental harm.'"[73] Thus, Castle Mountain maintains that "[t]he delay caused the permits to terminate, and the resultant unpermitted mining strongly implicates [Plaintiffs'] environmental, recreational, health, cultural, property, and public participation interests."[74]

The Court finds that Castle Mountain's asserted interests readily fall within the

---

[70] Docket 62 at 10. *See also* Dockets 38–49 (Declarations).

[71] Docket 62 at 13. The State also asserts that Castle Mountain has other avenues under the federal and state programs to seek redress. *See* Docket 62 at 14.

[72] Docket 65 at 13.

[73] *Id.* (citing 30 C.F.R. § 843.11(a)(2)).

[74] Docket 65 at 14.

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 18 of 35

zone of interests protected by the termination provision, as that provision does not relate only to the economic attributes of mining.  And Castle Mountain has shown it is adversely affected by the agency's interpretation of the termination provision.   In light of the foregoing, Castle Mountain has both Article III standing and the right to sue OSM over its interpretation of SMCRA's termination provision under the APA.

## IV.    THE SMCRA TERMINATION PROVISION

The APA directs courts to "hold unlawful and set aside" an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[75] Here, the question is whether the agency's interpretation of the termination statute is "not in accordance with law."[76]

In reviewing an agency's interpretation of a statute, a court's first task is to "determine whether 'Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"[77]

The statute at issue is 30 U.S.C. § 1256(c), which again provides that:

[A coal mining] permit shall terminate if the permittee has not commenced the surface coal mining operations covered by such permit within three years of the issuance of the permit: *Provided*, That the regulatory authority

---

[75] 5 U.S.C. § 706(2)(A).

[76] Although framed as cross-motions for summary judgment pursuant to Alaska Local Rule 16.3, in an APA case, "summary judgment merely serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 60 (D.D.C. 2014) (citation omitted).

[77] *Ariz. v. Tohono O'odham Nation*, 818 F.3d 549, 556 (9th Cir. 2016) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984)).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 19 of 35

may grant reasonable extensions of time upon a showing that such extensions are necessary by reason of litigation precluding such commencement or threatening substantial economic loss to the permittee, or by reason of conditions beyond the control and without the fault or negligence of the permittee . . . .

OSM upheld Alaska's interpretation of the provision "to mean that if mining operations do not commence within three years, and no extension is granted, the permit will not terminate automatically; rather, the permit remains valid until the regulatory authority takes an affirmative action to terminate it."[78] All Defendants support OSM's interpretation. Plaintiffs argue that OSM's interpretation is not in accordance with law because the phrase "shall terminate" is not ambiguous. Rather, Plaintiffs maintain that it unambiguously mandates permit termination when mining operations do not begin within three years of a permit's issuance and no explicit extension has been granted.

Accordingly, the Court must first determine if the disputed phrase "shall terminate" is ambiguous. "A statute is ambiguous if it is susceptible to more than one reasonable interpretation. The starting point is the statutory text. . . . When a statute does not define a term, we generally interpret that term by employing the ordinary, contemporary, and common meaning of the words that Congress used."[79] Here, the statute does not define the terms "shall" and "terminate." SMCRA was passed in 1977. In 1976, Webster's Third New International Dictionary explained that "shall" is "used in laws, regulations, or

---

[78] A.R. 22 (Docket 26-3 at 18).

[79] *Tohono O'odham Nation*, 818 F.3d at 556 (quotation marks omitted) (first quoting *Alaska Wilderness League v. EPA*, 727 F.3d 934, 938 (9th Cir. 2013), then quoting *Chevron*, 467 U.S. at 842–43, and then quoting *United States v. Gallegos*, 613 F.3d 1211, 1214 (9th Cir.2010)).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 20 of 35

directives to express what is mandatory," and defined "terminate" to mean "to bring to an ending or cessation in time, sequence, or continuity: CLOSE."[80] Thus, according to this dictionary frequently cited by the Supreme Court, around the time Congress debated SMCRA's termination provision an ordinary meaning of the phrase "shall terminate" would denote a mandatory ending.

Consistent with the ordinary meaning of the term "shall," the Supreme Court has repeatedly recognized that when Congress uses the word "shall," it is mandatory, and does not give an agency authority to disregard that directive. For example, in *Kingdomware Technologies, Inc. v. United States*, the Supreme Court held that "[u]nlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."[81] The Supreme Court has also observed that "the mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."[82]

---

[80] Webster's Third New International Dictionary 2085, 2359 (1976). The Supreme Court frequently cites various editions of this dictionary. *See, e.g., Voisine v. United States*, --- S. Ct. -- --, No. 14-10154, 2016 WL 3461559, at *5 (U.S. June 27, 2016) (citing the 1954 edition); *McDonnell v. United States*, --- S. Ct. ----, No. 15-474, 2016 WL 3461561, at *13 (U.S. June 27, 2016) (citing the 1961 edition); *Kellogg Brown & Root Servs., Inc. v. United States, ex rel. Carter*, 135 S. Ct. 1970, 1976 (2015) (citing the 1976 edition).

[81] 136 S. Ct. 1969, 1977 (2016); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016) (where the PLRA provides that "[a]n inmate 'shall' bring 'no action' . . . absent exhaustion of available administrative remedies . . . [t]here is no question that exhaustion is mandatory"); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661–62 (2007) (the statutory phrase "shall approve" means "EPA does not have the discretion to deny a transfer of an application); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (noting Congress' "use of a mandatory 'shall' . . . to impose discretionless obligations").

[82] *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 21 of 35

Highly persuasive to this Court on the issue of any ambiguity in SMCRA's termination provision is the Ninth Circuit decision of *Grand Canyon Trust v. Tucson Electric Power Co.*[83]  *Grand Canyon Trust* involved a termination provision in a Clean Air Act regulation that is structurally quite similar to the termination provision in SMCRA, as it contained both a mandatory termination provision and a permissive extension option. The regulation provided:

> Approval to construct [a power plant] shall become invalid if construction is not commenced within 18 months after the receipt of such approval, if construction is discontinued for a period of 18 months or more, or if construction is not completed within a reasonable time.  The Administrator may extend the 18–month time period upon a satisfactory showing that an extension is justified.[84]

In December 1977, Tucson Electric received a permit to construct two power plant units.  The construction of the units was completed in 1985 and 1990.  Many years later, in 2001, Grand Canyon Trust brought a citizen enforcement action against Tucson Electric asserting that Tucson Electric had failed to comply with the regulation because it had not commenced construction by the cut-off date, had discontinued construction for longer than eighteen months, and had not completed construction within a reasonable time.[85]

---

[83] 391 F.3d 979 (9th Cir. 2004).

[84] *Grand Canyon Trust*, 391 F.3d at 983.

[85] Subsequent amendments to the Clean Air Act imposed stricter technology requirements on newly-constructed power plants that had not commenced construction by March 19, 1979.  These requirements were important in *Grand Canyon Trust* because Grand Canyon Trust sought to impose those requirements on the already-constructed power plants, which could have cost Tucson Electric up to $300 million, and civil penalties for operating without the updated technology of up to $27,500 per day.  The issue is not particularly relevant to the statutory interpretation at issue in this case.  However, with regard to Defendants' focus on forfeiture, it bears noting that in

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 22 of 35

The Ninth Circuit agreed with Grand Canyon Trust, and held that a "natural reading" of the phrase "shall become invalid" provided for automatic permit invalidation, even though the term "automatic" was not in the statute itself:

> [W]e read this language to provide that a permit automatically becomes invalid in the enumerated circumstances unless the administrator exercises discretionary authority to extend the permit. On a natural reading of the language, administrative action is only required to forestall invalidation of a permit. No agency action is required to invalidate a permit if construction is not timely commenced.[86]

Like the regulation at issue in *Grand Canyon Trust*, the Court finds that "on a natural reading" of the SMCRA termination provision, the phrase "shall terminate" is self-executing, and "administrative action is only required to forestall invalidation of a permit." Defendants argue that the statute is ambiguous because it does not include the word "automatically" in reference to termination.[87] But like the regulation at issue in *Grand Canyon Trust*, a natural reading of 30 U.S.C. § 1256(c) compels a conclusion that use of the term "automatic" is not required to effectuate the termination by operation of law of a permit in these circumstances.

Textually, the statute as written is self-executing—it does not require the regulatory authority to take any action. If Congress had intended that the regulatory authority must or could take action to terminate the permit in the event that mining activities had not

---

*Grand Canyon Trust,* the Ninth Circuit held that "neither the requirement that Tucson Electric replace its emission-control equipment, nor the potential for civil fines, establishes the type of expectations-based prejudice that laches requires." *Id.* at 988.

[86] *Grand Canyon Trust*, 391 F.3d at 983–84.

[87] *See* Docket 59 at 25.

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 23 of 35

commenced, then the termination provision should have read: *The regulatory authority shall (or may) terminate a permit*. Other portions of SMCRA do expressly direct the agency to affirmatively take certain actions. For example, § 1260(a) provides "the regulatory authority shall grant, require modification of, or deny the application for a permit in a reasonable time set by the regulatory authority . . . . [T]he regulatory authority shall notify the local governmental officials . . . that a permit has been issued . . . .";
§ 1271(a)(2) provides "the Secretary or his authorized representative shall immediately order a cessation of surface coal mining and reclamation operations" when, on the basis of federal inspection, OSM determines the permittee is in violation of SMCRA; and
§ 1271(a)(4) provides "the Secretary or his authorized representative shall forthwith issue an order to the permittee to show cause . . . ." In contrast, that the termination statute does not mandate any action by the agency makes clear that Congress intended permit termination to be self-executing.

The Federal Defendants acknowledge that the term "shall" is generally mandatory, but observe that it is not always the case. They cite to the Supreme Court's decision in *Gutierrez de Martinez v. Lamagno,* a Westfall Act case in which the Court held that the use of the phrase "shall be deemed an action against the United States" when the United States was substituted as a party did not preclude subsequent judicial review of the agency's scope-of-employment certification that effectuated the substitution.[88] In *Gutierrez,* the Supreme Court observed in a footnote that "[t]hough 'shall' generally

---

[88] 515 U.S. 417 (1995).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 24 of 35

means 'must,' legal writers sometimes use, or misuse, 'shall' to mean 'should,' 'will,' or even 'may'".[89]   The Supreme Court held that judicial review of the certification decision was permitted, despite the finality of the language "shall be deemed," because to construe the Westfall Act otherwise "would oblige [the Court] to attribute to Congress two highly anomalous commands[:] . . . that Congress, by its silence, authorized the Attorney General's delegate to make [certification determinations without any judicial check[,] [and that Congress] cast Article III judges in the role of petty functionaries . . . stripped of capacity to evaluate independently whether the executive's decision is correct."[90]   Here, there are none of the separation-of-powers issues that informed the Supreme Court's construction of the Westfall Act in *Gutierrez*.

The Federal Defendants place considerable emphasis on *Sierra Club v. Jackson*,[91] which concerned whether the administrator of the Environmental Protection Agency had

---

[89] The footnote in *Gutierrez* continued:

> See D. MELLINKOFF, MELLINKOFF'S DICTIONARY OF AMERICAN LEGAL USAGE 402–03 (1992) ("shall" and "may" are "frequently treated as synonyms" and their meaning depends on context); B. GARNER, DICTIONARY OF MODERN LEGAL USAGE 939 (2d ed. 1995) ("[C]ourts in virtually every English-speaking jurisdiction have held—by necessity—that *shall* means *may* in some contexts, and vice versa.") For example, certain of the Federal Rules use the word "shall" to authorize, but not to require, judicial action. See, *e.g.,* Fed.Rule Civ.Proc. 16(e) ("The order following a final pretrial conference *shall* be modified only to prevent manifest injustice.") (emphasis added); Fed.Rule Crim.Proc. 11(b) (A *nolo contendere* plea "*shall* be accepted by the court only after due consideration of the views of the parties and the interest of the public in the effective administration of justice.") (emphasis added).

*Gutierrez*, 515 U.S. at 433 n.9.

[90] *Id.* at 426.

[91] 648 F.3d 848 (D.C. Cir. 2011).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 25 of 35

a mandatory duty to take enforcement action under a provision of the Clean Air Act that

provides in relevant part:

> The Administrator shall, and a State may, take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting facility . . . .[92]

The Sierra Club argued that the plain text of the statute made enforcement by the

Administrator mandatory. The D.C. Circuit Court noted that "[t]he Sierra Club's textual

argument carries considerable weight. As we have repeatedly noted, 'shall' is usually

interpreted as the language of command."[93]   However, the Circuit Court ultimately

disagreed with the Sierra Club because although the statute directed the Administrator to

act, it only required that the Administrator take such measures "as necessary" and

provided "no guidance . . . as to what action is 'necessary.'"[94]  The Court does not find

*Sierra Club* to be helpful in resolving whether the SMCRA statute is not ambiguous,

because the disputed statutory language in this case does not contain the lack of

specificity that was present in *Sierra Club*.  And textually, the language of SMCRA's

termination provision is quite different because it does not command the agency to do

anything at all.

Further support for finding that SMCRA's termination statute unambiguously

results in permit termination by operation of law when mining operations have not

commenced derives from the context in which the language appears.  For while the

---

[92] 42 U.S.C. § 7477.

[93] *Sierra Club*, 648 F.3d at 856 (quotation marks and citations omitted).

[94] *Id.*

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 26 of 35

statute clearly directs that a permit shall terminate, it also provides that the agency "may grant reasonable extensions." If the statute were read permissively to allow but not require permit termination if operations had not commenced, regardless of the reason for the delay in commencing operations, then effectively the two limited exceptions to the permit termination would have no purpose in the statute. And yet, "[i]f possible, every word and every provision is to be given effect . . . . None should be ignored. None should needlessly be given an interpretation that causes it to . . . have no consequence."[95] To comply with this interpretive canon, the words "shall" and "may" should be accorded different meanings in SMCRA's termination provision.

The Supreme Court has observed that "[w]hen a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty."[96] The import of the use of both words in a statute was discussed in *Center for Biological Diversity v. United States Fish & Wildlife Service*.[97] In that case, the Ninth Circuit upheld the United States Fish and Wildlife Service's decision to not complete a formal designation of critical habitat for an endangered fish species. The disputed language in the Endangered

---

[95] ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012).

[96] *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016). In *Kingdomware*, the Supreme Court held that a statute was unambiguously mandatory because it "requires that 'a contracting officer of the Department *shall* award contracts' to veteran-owned small businesses using restricted competition whenever the Rule of Two is satisfied, '[e]xcept as provided in subsections (b) and (c).' (Emphasis added.) Subsections (b) and (c) provide, in turn, that the Department 'may' use noncompetitive procedures and sole-source contracts for lower value acquisitions. . . . Congress' use of the word 'shall' demonstrates that § 8127(d) mandates the use of the Rule of Two in all contracting before using competitive procedures."

[97] 450 F.3d 930, 935 (9th Cir. 2006).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 27 of 35

Species Act (ESA) used both the terms "shall" and "may."  The Circuit Court held that "[w]hen 'may' and 'shall' are both used in a statute, 'the normal inference is that each is being used in its ordinary sense—the one being permissive, the other mandatory.'"[98]  Put another way, the Circuit Court found that Congress knew the difference between "may" and "shall" when it used them together in that provision of the ESA.

The Federal Defendants maintain that even when "shall" and "may" appear together, their meaning depends on context.[99]  In the disputed statute here, they assert that "[t]here is no direction, in the exception proviso, that the extension come at a particular time, either before or after three years has run."[100]  To the Federal Defendants, because the statute accords the agency the discretion to grant reasonable extensions at any time, "[t]he only statutory command is that once the regulatory authority determines that a permit extension is 'necessary' to prevent inequity, the extension must be 'reasonable'—a word that clearly envisions a range of permissible outcomes."[101]  But this argument overlooks that fact that extensions can be granted under the statute for only two specific reasons.  Thus, unlike the statute in *Sierra Club* that directed the administrator to take unspecified measures "as necessary," SMCRA provides only two specific bases on which the regulatory authority can grant permit extensions.[102]

---

[98] *Id.* (quoting *Haynes v. United States*, 891 F.2d 235, 239–40 (9th Cir. 1989).

[99] Docket 59 at 27.

[100] Docket 59 at 29.

[101] Docket 59 at 29.

[102] *See supra* notes 91–94 and accompanying text.

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 28 of 35

The Federal Defendants also cite to *Citizens Association for Sound Energy v. United States Nuclear Regulatory Commission.*[103]  In that case, the United States Court of Appeals for the District of Columbia Circuit found permissible the Nuclear Regulatory Commission's (NRC's) statutory interpretation that automatic forfeiture did not result when an operator failed to meet the deadline to file for a permit extension under the Atomic Energy Act.  The statute at issue in that case, 42 U.S.C. § 2235, provided:

> The construction permit shall state the earliest and latest dates for the completion of the construction or modification. Unless the construction or modification of the facility is completed by the completion date, the construction permit shall expire, and all rights thereunder be forfeited, unless upon good cause shown, the Commission extends the completion date.[104]

The operator applied for an extension approximately six months after the permit expiration date, which the NRC issued.  Citizens Association for Sound Energy challenged the agency action, arguing in part that the operator's failure to apply for an extension prior to the permit's expiration caused "a complete forfeiture of the permit, such as to preclude the issuance of an extension."[105]  The D.C. Circuit Court disagreed, holding that "[t]he plain language of [§ 2235] permits the Commission to extend a completion date for 'good cause.'  There is no language specifying that the expiration of the construction permit automatically effects forfeiture of the permit, or that the Commission is then barred from

---

[103] 821 F.2d 725 (D.C. Cir. 1987).

[104] *Citizens Ass'n for Sound Energy*, 821 F.2d at 730.

[105] *Id.*

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 29 of 35

an application to extend the latest construction date."[106]  The Federal Defendants assert

the case supports a finding that the statute at issue here is not unambiguous and that

OSM's interpretation of the termination provision in SMCRA is reasonable.[107]

*Citizens Association* did not require the D.C. Circuit to analyze the plain meaning

of the phrase "shall expire" as used in the statute at issue.  Rather, the Circuit Court

focused on the broad "good cause" exception to permit expiration.  And that statute

contained only the term 'shall' and not the SMCRA provision's combination of "shall" and

"may."  Most importantly, the case did not address the automatic termination of a permit

when no extension had been sought or granted at all—either before or after the permit

expiration date—as is the case here.  In short, the Court does not find that the D.C.

Circuit's analysis in *Citizens Association* demonstrates that the termination provision at

issue here is ambiguous.

To interpret the provision as OSM has done—so as to permit an interpretation that

makes termination dependent on agency action—reads additional words and conditions

into the statute that simply are not there.  Moreover, because SMCRA sets the floor to

which state programs must comply, Alaska's statute must be in accordance with the

---

[106] *Id.*

[107] Docket 59 at 32.  The State of Alaska and Usibelli do not directly address the ambiguity question, although the State joins the Federal Defendants' brief on the meaning of "shall."  *See* Docket 62 at 27.  Usibelli adds that if "shall" in SMCRA "demonstrates Congressional intent to require *automatic* termination . . . the fact that the Alaska statute . . . does *not* use the word 'shall' should support the construction that under Alaska law, there is no automatic termination."  *See* Docket 61 at 18.  However, since the federal law sets the floor to which primacy states must comply, Alaska cannot adopt a statute that is less stringent than SMCRA.  *See supra* notes 8–11 and accompanying text.

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 30 of 35

termination provision of § 1256(c). Based on the foregoing analysis, the Court finds that SMCRA's termination provision is not ambiguous. Rather, Congress has directly spoken to the precise question and has provided that a surface coal mining permit terminates by operation of law when mining operations have not commenced within three years unless the agency has affirmatively granted an extension for one of the two specified reasons allowed in the statute. OSM's contrary interpretation regarding the Wishbone Hill permits is not in accordance with law, and must be set aside, for the Court, as well as OSM and the State of Alaska, must give effect to the unambiguously expressed intent of Congress.[108]

A review of SMCRA's legislative history on this provision does not warrant a contrary result. The parties cite to portions of SMCRA's or ASCMCRA's legislative history as supporting their positions.[109] On balance, the Court finds that the legislative history cited by the parties does not squarely address the issue before the Court, and is, in any event, unnecessary to parse when the statute itself is unambiguous.[110]

---

[108] *Chevron, U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984).

[109] Docket 37 (Castle Mountain Mot.) at 29–32; Docket 65 (Castle Mountain Reply) at 23; Docket 60 (Fed. Defendants' Opp.) at 34–38; Docket 62 (State of Alaska Opp.) at 25; Docket 61 (Usibelli Opp.) at 17; *see also* Docket 33-1 (Alaska DNR Commissioner Decision) at 2–4 and 8–11.

[110] The State of Alaska asserts that Alaska's legislative history is the relevant authority and that the DNR Commissioner determined that "where possible, the state legislation sought to reduce some of the burdens imposed by the federal legislation and implement a program more tailored to the needs of Alaskans." The State asserts that "[a]utomatic termination is inconsistent with this legislative purpose." Docket 62 at 25. The Court finds this assertion contrary to the law. Alaska coal mining regulations may not "reduce" the burden of SMCRA. Rather, as already stated, Alaska regulations must be "in accordance" with SMCRA or they may be "more stringent." Therefore, Alaska's termination provision must also mean that permits terminate automatically unless a valid extension is granted. *See supra* notes 8–11 and accompanying text.

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 31 of 35

The parties have also discussed how the law of forfeiture should affect the outcome in this case. OSM's decision referenced several older forfeiture cases, and reasoned that because SMCRA "does not give 'clear and unequivocal' warning that automatic termination of the permit could result from missing the three-year deadline," it is preferable to interpret the Act to not require permit termination.[111] The Federal Defendants add to this line of reasoning by citing to various statutes and regulations that they assert provide a clear lesson: "when Congress (or an agency) chooses to make termination of a license, lease, or permit automatic, it does so explicitly, giving full notice to licensees to be on their guard against forfeiture of their vested rights. The failure to do so in [the termination provision] indicates, quite simply, that that is not the outcome that Congress intended."[112] In effect, the Federal Defendants argue that the phrase "shall terminate" is not sufficiently clear to apprise a permit holder that the permit shall terminate if mining operations are not commenced within the requisite three years or extended period. But, as explained above, this Court disagrees, and finds the phrase "shall terminate" to be free from ambiguity as to the consequence of a failure to commence mining operations when no exception applies.

---

[111] Docket 26-3 at 2–4; *see also United States v. Model Ford V-8 De Luxe Coach, Motor No. 18-3306511*, 307 U.S. 219, 226 (1939) (citing *Farmers' & Mechanics' Nat'l Bank v. Dearing*, 91 U.S. 29, 33–35 (1875)); *Am. Maritime Ass'n v. Blumenthal*, 590 F.2d 1156, 1165 (D.C. Cir. 1978).

[112] Docket 60 at 34. Usibelli and Alaska both maintain forfeiture arguments under Alaska law. *See* Docket 61 at 16–17; Docket 62 at 28. But, as the Court has made clear, Alaska law does not provide the rules of decision in this case.

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 32 of 35

Moreover, unlike the cases cited by the Federal Defendants, the loss of a surface coal mining permit for failing to commence operations is not a penalty for violating a federal law. Rather, it is a statutory condition of the permit itself: Usibelli received the permits and subsequent renewals subject to "[a]ll conditions and stipulations of the original permits" that by their own terms did not "relieve the permittee of the responsibility for compliance with any federal, state or local law or regulation."[113] This would encompass the termination and extension provisions. The Federal Defendants refer to the permits as giving licensees "vested rights."[114] But no party has cited to any case that found vested rights that continue beyond a permit's termination. Rather, Castle Mountain has cited cases that hold precisely the opposite.[115] The fact that other statutes and regulations, cited by Defendants, use different language than SMCRA to effect a termination does not render SMCRA's language non self-executing. Moreover, when the termination provision is properly enforced, it is not clear that a significant forfeiture would even occur. For if properly enforced, a permit would terminate before any mining operations had commenced, thereby minimizing any economic losses. And Plaintiffs concede that "the statute places no express time limits on when an extension may be

---

[113] *See* Docket 28-7 (Permit Transfer) at 1–2; Docket 28-4 at 12–22 (2002 Permit Renewal); Docket 28-1 at 4–6 (2006 Permit Renewal).

[114] Docket 60 at 34.

[115] *Bd. of Regents v. Roth*, 408 U.S. 564, 578 (1972) (assistant professor's property interest in continued employment extended only to the end date of his contract); *Kraft v. Jacka*, 872 F.2d 862, 867–68 (9th Cir. 1989), *abrogated on other grounds by Dennis v. Higgins*, 498 U.S. 439 (1991) (no protected property interest continued after the automatic expiration of limited gaming licenses).

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 33 of 35

granted."[116]  Accordingly, it may be that under SMCRA the regulatory authority can extend the time to commence mining even after a permit has terminated, provided the statutory grounds for extension have been met.  This Court need not determine that issue in this proceeding.  In sum, because the termination provision in SMCRA is unambiguous, OSM's and Defendants' assertions regarding forfeiture law are inapposite.

## CONCLUSION

In light of the foregoing, the Court finds that the phrase "shall terminate" as set forth in section 1256(c) of the Surface Mining Control and Reclamation Act is unambiguous, in that a surface mining permit terminates by operation of law if mining operations have not timely commenced under that statute unless an extension has been granted pursuant to the statute's terms.  Accordingly, Castle Mountain Coalition's Motion for Summary Judgment at Docket 36 is GRANTED; and the Office of Surface Mining Reclamation and Enforcement's Motion for Summary Judgment at Docket 58 is DENIED. The Office of Surface Mining Reclamation and Enforcement Office's determination that SMCRA does not require permit termination when surface coal mining operations have not commenced within three years of permit issuance and no valid extension has been granted, and that DNR therefore had good cause for not taking corrective action in response to the ten-day notices regarding the Wishbone Hill permits, is VACATED.  This

---

[116] Docket 65 at 20.

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 34 of 35

matter is REMANDED to the agency for further proceedings consistent with this decision.

The Clerk of Court is directed to enter judgment for Plaintiffs accordingly.

DATED this 7th day of July, 2016 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:15-cv-00043-SLG, *Castle Mountain Coalition, et al. v. Office of Surface Mining Reclamation and Enforcement, et al.*
Order re Cross-Motions for Summary Judgment
Page 35 of 35